# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 10, 2017

## STATE OF TENNESSEE v. LESTER ARNOLD CLOUSE

**Appeal from the Criminal Court for White County**
**No. CR676   Larry B. Stanley, Jr., Judge**

**No. M2016-00707-CCA-R3-CD**

FILED

JUL 20 2017

Clerk of the Courts

A White County jury convicted Defendant, Lester Arnold Clouse, of aggravated assault, assault, and resisting arrest. The trial court merged the resisting arrest conviction into the aggravated assault conviction and sentenced Defendant to an effective fifteen-year sentence as a Range III, persistent offender, to be served consecutively to other outstanding sentences. On direct appeal, this court affirmed Defendant's convictions but reversed his sentence and remanded the case for a new sentencing hearing. *See State v. Lester Arnold Clouse*, No. M2013-02633-CCA-R3-CD, 2014 WL 7332181, at *1 (Tenn. Crim. App. Dec. 23, 2014). Following a sentencing hearing on remand, the trial court imposed an effective fourteen-year sentence as a Range III, persistent offender to be served consecutively to his sentences for other convictions. On appeal, Defendant challenges the trial court's finding that he qualified as a persistent offender, the length of his sentence, and the imposition of partial consecutive sentences. After a thorough review of the record and the applicable law, we affirm Defendant's sentences for aggravated assault and assault, and we reduce Defendant's sentence for resisting arrest, a Class B misdemeanor, to six months. We remand the case to the trial court for entry of a corrected judgment on the resisting arrest conviction to reflect that the conviction is merged into Defendant's aggravated assault conviction in accordance with the trial court's prior findings.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Billy K. Tollison, Sparta, Tennessee, for the appellant, Lester Arnold Clouse.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Howard Chambers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

Defendant was indicted on seventeen counts of arson, two counts of aggravated assault, and one count of resisting arrest. Following his first trial in 2001, Defendant was convicted of five counts of arson, two counts of aggravated assault, and one count of resisting arrest. On direct appeal, this court reversed the Defendant's convictions and remanded the case to the trial court for a new trial due to errors resulting from the co-defendant's invocation of his Fifth Amendment privilege at trial. *See State v. Lester Arnold Clouse*, No. M2002-00124-CCA-R3-CD, 2004 WL 193069, at *1 (Tenn. Crim. App. Jan. 30, 2004).

Following the retrial in June 2005, the jury acquitted Defendant of the arson charges and convicted him of aggravated assault, assault, and resisting arrest. Prior to the retrial, the State filed a notice of its intent to seek to enhance the Defendant's sentence as a career offender. At the conclusion of the October 2005 sentencing hearing, the trial court requested the parties to submit supplemental briefs by November 11, 2005, after which the trial court would file an order within thirty days. The State subsequently filed a pleading stating that Defendant should be classified as a persistent offender rather than a career offender. In December 2005, the Defendant filed a motion for new trial. Thereafter, the original trial judge left the bench without entering a sentencing order.

In March 2007, a successor judge was appointed to hear the matter after the other judges in the district recused themselves due to a conflict of interest. The successor judge signed the judgment orders on February 22, 2008, sentencing Defendant to fifteen years in confinement as a Range III, persistent offender for aggravated assault and eleven months and twenty-nine days for assault. The successor judge merged the resisting arrest conviction into the aggravated assault conviction and ordered that Defendant's sentences for aggravated assault and assault run concurrently to each other but consecutively to other outstanding sentences. The successor judge, however, did not rule on Defendant's motion for new trial.

In September 2009, Defendant filed a pro se motion in this court seeking permission to late-file a notice of appeal. This court ordered trial counsel to respond, and trial counsel filed a response stating that the motion for new trial was pending in the trial court and that, thus, the case was not yet ripe for appeal. As a result, this court entered an order on November 4, 2009, denying Defendant's pro se motion. *See State v. Lester*

*Arnold Clouse*, No. M2009-02006-CCA-MR3-CD (Tenn. Crim. App. Nov. 4, 2009) (order).

On September 12, 2010, trial counsel filed a motion in the trial court requesting that a hearing on the motion for new trial be set. In October 2010, a successor judge was appointed to hear the matter, but Defendant's motion for new trial was not heard. In July 2013, another successor judge was appointed, and following a hearing, the trial court entered an order denying the motion for new trial on October 11, 2013.

On direct appeal, this court affirmed Defendant's convictions but reversed his sentences due to the lack of oral or written findings setting forth the reasons for Defendant's sentences. *Lester Arnold Clouse*, 2014 WL 7332181, at *1, 11. Following a sentencing hearing on remand, the trial court sentenced Defendant to fourteen years in confinement as a Range III, persistent offender for the aggravated assault conviction and eleven months and twenty-nine days for each of the assault and resisting arrest convictions. The trial court ordered Defendant to serve the sentences concurrently to each other but consecutively to his sentences for other convictions in Putnam County. Defendant appeals his sentences.

*Trial*

Defendant's convictions stem from his actions on October 26, 1999, when Deputy David Gibbons of the Putnam County Sheriff's Department stopped a car in which Defendant was a passenger during the course of Deputy Gibbons's investigation of multiple fires that had been set around the Putman/White County line. *See Lester Arnold Clouse*, 2014 WL 7332181, at *2. The car was driven by co-defendant Michael Shane Carter. *Id.* On appeal, this court summarized the evidence presented at retrial regarding the events that occurred during the stop as follows:

> Deputy Gibbons. . .stat[ed] that as he was running co-defendant Carter's information, he noticed both occupants exit the vehicle. Around that time, Deputy Bill Harris arrived, and Deputy Gibbons learned that there was a warrant for co-defendant Carter's arrest. Deputy Gibbons requested Deputy Harris to approach the passenger side of the vehicle but advised him that he had previously seen a crossbow in the back seat. Deputy Gibbons then approached the driver's side and placed co-defendant Carter under arrest.
>
> In the meantime, Deputy Linda Dilldine arrived on the scene. Deputy Gibbons then noticed that [Defendant] had exited the vehicle but was leaning into the backseat of the vehicle. He heard Deputy Harris order [Defendant] to move away from the vehicle and place his hands on top of

- 3 -

it. [Defendant] said that he was "checking on some clocks, [and] he didn't want them to get damaged." When [Defendant] stepped away, he was holding the crossbow and then placed it on top of the vehicle. Deputy Gibbons described [Defendant] as "irate." He began screaming at officers, "'I've not done anything wrong.'" [Defendant] walked around to the front of the vehicle and wielded a pocket knife.

Deputy Gibbons testified that he transferred control of co-defendant Carter, who was then handcuffed, to Deputy Dilldine. He and Deputy Harris approached the front of the vehicle and each stood close to the front tires on opposite sides. [Defendant] continued "screaming" at officers, "'I've not done anything wrong.'" He continued waving the knife at them. Officers shouted commands at [Defendant], but he refused to comply. He repeated that he had done nothing wrong and told the officers to "leave [him] alone." Deputy Gibbons confirmed that the knife had been in [Defendant's] right pocket. During the encounter they were four to five feet away from [Defendant], and Deputy Gibbons felt threatened.

Deputy Gibbons explained that after about a minute had passed, [Defendant] began to flee. He ran down the road, and officers gave chase. They pursued [Defendant] through a field toward the back of it. He continued to threaten them with the knife, and at one time, [Defendant] held it to his own neck and threatened to kill himself. Other officers responded to the scene, and someone sprayed [Defendant] with mace pepper spray then kicked the knife out of his hand. Deputy Gibbons confirmed that the encounter took place in White County. After co-defendant Carter and [Defendant] were arrested, there were no further reports of fires being set in the area.

On cross-examination, Deputy Gibbons acknowledged that he and Deputy Harris had their guns drawn on [Defendant] when he wielded the knife. He clarified that although he maintained a short distance between himself and [Defendant], he was still within the "reactionary gap" of six feet in which he could have potentially been cut by the knife despite his holding a weapon.

The State's next witness was Deputy Bill Harris with the Putnam County Sheriff's Department, who stated that he responded to the area where someone had reported that people in a small black sports car were setting fires. He began his patrol about two or three miles from the Putnam/White County line, and as he followed the fires, he arrived at the location where Deputy Gibbons had stopped co-defendant Carter's vehicle.

When he first arrived, Deputy Gibbons was in his patrol car checking warrants and personal information on co-defendant Carter, and Deputy Harris observed that [Defendant] had exited the two-door vehicle and was leaning into the backseat area through the open door. When Deputy Harris approached [Defendant] to ask him to back out of the vehicle, appellant produced a crossbow from the back seat and placed it on the roof of the vehicle. He then attempted to re-enter the vehicle, stating that there was an antique clock that he did not want damaged. While [Defendant] was searching for the clock, Deputy Harris observed arrows for the crossbow and some matches. At that time, Deputy Harris reached toward [Defendant] to grab his arm and pull him away from the arrows. However, before he could do so, [Defendant] pulled away from him and ran to the front of the vehicle.

Deputy Harris recalled that at that time, [Defendant] withdrew a knife from his right pocket and opened it. Deputy Harris drew his weapon and ordered [Defendant] to put down the knife. [Defendant] began "screaming and yelling not to come any closer, to stay away from him." Deputy Harris said that he "felt threatened, very threatened." He recognized that he was within the "reactionary gap" where he could be cut with the knife before he was able to defend himself. [Defendant] then began to "back-pedal" down the road while still holding the knife. The chase continued into a nearby field. Somehow, [Defendant] retrieved his cellular telephone and called his mother. He told her, "'[T]hey're trying to kill me.'" Eventually, other law enforcement officers arrived, including a canine handler who brought a "dual purpose attack dog." The canine officer told [Defendant] that if he did not put down the knife, he would release the dog on him. Deputy Harris stated, "The dog was eventually let loose[,] and . . . I don't know that it ever bit him, but it was just enough for us to get on him and get the knife out of his hand."

On cross-examination, Deputy Harris confirmed that there were no fires on the roadside beyond the location where [Defendant] was apprehended. Prior to reaching co[-]defendant Carter's vehicle, there were fires every ten to twenty yards.

The State called Kimberly Sells as its next witness. On October 26, 1999, she lived on Cunningham Road in White County, which is located approximately one-half mile south of the county line. Prior to moving to Tennessee, Ms. Sells had been employed as a sheriff's deputy in Indiana and had received training in "flash recognition," among other areas. On that date, around 4:30 p.m., a small black car drove southbound past her

house very slowly, and "it was not one known to be in that area." She was standing next to a fence approximately five or six feet from the road, and the passenger leaned out of the window and yelled, "Hey, baby," in her direction. Ms. Sells identified the passenger as [Defendant].

Shortly after the vehicle passed, Ms. Sells looked northward and "noticed smoke billowing from the ditch." She looked south and observed another small fire located south of her house, also in a ditch. Both fires were on the west side of the road, which would have been the passenger side of the passing vehicle. Between fifteen to thirty seconds later, several law enforcement vehicles sped by.

[Defendant] then presented Gus Barbutis as his first witness, who was [Defendant's] seventy-eight-year-old neighbor. He recalled seeing [Defendant] on the date in question around 2:00 p.m. when he drove home, but he did not see [Defendant] after that.

Rita Clouse, [Defendant's] mother, also testified and said that she returned home on the date in question around 3:00 or 3:15 p.m. and that [Defendant] was at home when she arrived. He had been repairing a truck. A little while later, co-defendant Carter arrived, and after the two men conversed in the back yard, they left together around 4:00 p.m.

Charlene Austin, [Defendant's] next witness, testified that she visited [Defendant] at his home around 1:00 or 2:00 p.m. on the date in question.

[Defendant] testified on his own behalf. He explained that on the date in question, his mother had a dentist appointment and that he had to stay at home in case she needed a ride after her procedure. He said that he worked on cars for a living and that he owned a small junkyard. While his mother was away, he worked at home and replaced the glass in a truck between 10:30 a.m. and 1:00 p.m. As he was working, another individual stopped by and asked him to replace the sliding glass window in his vehicle. [Defendant] stated that around 2:00 p.m., he went across the road to the junkyard, where he removed the glass from another vehicle and saw Mr. Barbutis walking his dog. [Defendant] returned home and completed the repair around 3:00 or 3:15 p.m. His mother returned home and began to prepare something to eat. Co-defendant Carter arrived between 4:00 and 4:07 p.m., and they subsequently left together.

[Defendant] stated that they were going to drive to Livingston so he could sell some antique clocks and other items. He said that they drove to Cookeville via the interstate and exited to get a drink. According to [Defendant], co-defendant Carter wanted to drive to Sparta because he intended to sell his crossbow to someone there. They traveled various roads and eventually turned onto Post Oak Road from Cunningham Road. The vehicle had proceeded "a short distance" on Cunningham Road when a Putnam County law enforcement officer approached with emergency equipment activated. [Defendant] testified that he instructed co-defendant Carter to pull over and let the vehicle pass but that the vehicle stopped behind them. [Defendant] exited the vehicle and Officer Gibbons addressed him, "'[W]hat's going on, Pokey?'" Officer Gibbons asked co-defendant Carter for his driver's license, and when he could not produce it, Officer Gibbons "ran a check" on Carter. [Defendant] explained that the glass clock had fallen onto the floorboard of the back seat so he retrieved it and wrapped a shirt around it to protect it from damage. He was about to place the clock back in the car when Officer Dilldine walked up and said, "'[L]ook out, he's got a gun in the car.'" [Defendant] responded that there was no gun in the car, and he picked up the crossbow and placed it on top of the car.

[Defendant] recalled that someone then mentioned the warrant for co-defendant Carter, so he reached into the vehicle to obtain his belongings because he did not want his valuables to be towed away. When he backed out, officers "had guns pulled" on him. He said that he asked officers what was wrong with them. He stated that he called the man in Livingston whom he was supposed to meet and told him, "'Putnam County Police [have] me pulled over in White County and [have] their guns drawn on [me] . . . call the White County Sheriff's Department and the FBI and let them know what [is] going on. . . .'" He thought they were "going to try to kill" him. [Defendant] testified that he reached into his pocket and pulled out a knife. He opened it, stuck it toward his throat, and told officers he would kill himself before he would let them kill him. He also said that he informed officers that they lacked jurisdiction in White County. He explained that he was afraid of the officers because they had killed two people previously in Putnam County, including his father. [Defendant] concluded his direct testimony by disavowing any knowledge of the fires that were set.

On cross-examination, [Defendant] acknowledged that he had pleaded guilty to theft of property valued at more than $1,000 but less than $10,000 in 1999 and that he was on unsupervised probation when these

- 7 -

offenses occurred. He denied having shouted anything at Ms. Sells because he "was a married man at the time" they were stopped by officers. He confirmed that the encounter with law enforcement ended when he was sprayed with pepper spray and the knife was kicked from his hand. He added that the attack dog bit him in the leg in the melee. [Defendant] denied having threatened officers with his knife. He said that his mother wanted to speak to one of them to ask what was happening but that they would not speak to her.

*Lester Arnold Clouse*, 2014 WL 7332181, at *2-5.

*Resentencing Hearing*

During the sentencing hearing on remand, Scott Muncey, a probation and parole officer for the Tennessee Department of Correction (TDOC), testified that he filed an updated presentence report based on information that he gathered from Defendant's prior presentence report and the State's file. Mr. Muncey did not review the case file from the trial court clerk's office. He included in the presentence report disciplinary actions against Defendant for the past five years while Defendant was in TDOC custody.

Mr. Muncey identified eight prior judgments of conviction against Defendant. The certified copies of the judgments, which were entered into evidence, provided as follows:

| Case No. | County | Conviction | Offense Date | Sentence |
|---|---|---|---|---|
| 97-0458 | Putnam | Theft over $10,000 | 7/1/97 | 4 years probation |
| 7677 | White | Aiding and abetting grand larceny | 8/9/88 | 10 years |
| 88-201-F | Putnam | Receiving stolen property | 4/7/88 | 10 years |
| 88-203-F | Putnam | Receiving stolen property | 4/7/88 | 10 years |
| 87-29-F | Putnam | Concealing stolen property over $200 | Unknown (date is not listed in the judgment) | 3 years with 6 months incarceration followed by community corrections |
| 87-30-F | Putnam | Possession of property with serial number altered or removed | 9/29/86 (per presentence report) | 2 years with 6 months incarceration followed by community corrections |

- 8 -

| 86-355-F | Putnam | Concealing stolen property over $200 | 9/22/86 (per presentence report) | 5 years with 6 months incarceration followed by community corrections |
|---|---|---|---|---|
| 1656 | Overton | Second degree burglary and grand larceny | 8/1/86 (per presentence report) | 5 years for second degree burglary and 3 years for grand larceny |

According to the presentence report, Defendant also had multiple prior traffic-related convictions, as well as convictions for public intoxication.

Defendant presented the testimony of Leda Charlene Austin, who had known Defendant for approximately twenty years and cared for Defendant's mother. Ms. Austin testified that Defendant's mother had dementia and resided in a nursing home. Ms. Austin did not know whether Defendant would be able to see his mother before she passed away if he was not released from jail soon.

Ms. Austin testified that she had noticed a change in Defendant. She explained that he now states in his letters to "keep the faith, God bless you," which he did not do years ago. On cross-examination, Ms. Austin acknowledged that Defendant had been in and out of jail but stated that she believed Defendant had changed and that "[t]he only thing on his mind right now is his mother."

Defendant testified that his convictions in Overton County in case number 1656 for second degree burglary and grand larceny and in Putnam County in case number 86-355-F for concealing stolen property valued over $200 arose from the same facts and, therefore, should be considered one conviction for determining his sentencing classification. He stated that those offenses to which he pled guilty on the same day should be considered one conviction for determining his sentencing classification. He reasoned that "the law says if you're in court one day and you get ten sentences[,] it stands as one conviction."

Defendant requested that the trial court also consider an "Order Clarifying Prior Judgments and Rescind[ing] Amended Judgments" entered on December 11, 1995. The order clarified that Defendant's ten-year sentence for his receiving stolen property conviction in case number 88-201-F was to run concurrently with his sentences in Putnam County case numbers 86-355-F, 87-29-F, 87-30-F, and 88-203-F and White County case number 7677. The order also clarified that Defendant's sentence in White County case number 7677 was to run concurrently with his sentences in the above-listed Putnam County cases. Defendant maintained that based on this order, the cases referenced in the order should constitute one conviction for purposes of determining his

sentencing classification. He requested that the trial court sentence him to three years as a Range I, standard offender.

Defendant testified that following his arrest in October 1999, he was indicted on various arson-related offenses in Smith, White, Putnam, and DeKalb Counties. He was first acquitted of the charges in DeKalb County. He was then tried in the present case in White County and convicted of multiple offenses, including arson and aggravated assault. He was convicted of various offenses in Putnam County. He was then retried in the present case following the reversal of his convictions on appeal.

Defendant challenged the propriety of his convictions for aggravated assault, assault, and resisting arrest in the present case, arguing that because the State failed to present the knife at trial, the evidence was insufficient to establish that he used a deadly weapon. He maintained that when he was stopped, he was in fear of his safety due to his prior history with law enforcement. He also maintained that he did not threaten the officers with a knife but threatened to harm himself with the knife.

Defendant testified that he was released on bond for a few months following his arrest. He said that while he was out on bond, he was responsible for transporting his mother to receive dialysis.

On cross-examination, Defendant testified that he did not know whether he could complete his sentence on probation or parole because he had never been afforded the opportunity to do so. He acknowledged that he had previously been released on parole but that he was required to return to jail on each occasion as the result of "technical" violations. The State informed the trial court that Defendant was on probation when he committed the offenses of aggravated assault, assault, and resisting arrest.

The trial court classified Defendant as a Range III, persistent offender for his aggravated assault conviction. The trial court applied the following enhancement factors: (1) Defendant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; (2) Defendant was "a leader in the commission of an offense involving two (2) or more criminal actors"; (9) Defendant possessed or employed a firearm or other deadly weapon during the commission of the offense; and (10) Defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(1), (2), (9), (10) (1997). The trial court gave little weight to the enhancement factor that Defendant was a leader in the commission of an offense. The trial court sentenced Defendant to fourteen years for aggravated assault and eleven months and twenty-nine days for each of his convictions for assault and resisting arrest.

In determining whether to impose consecutive sentences, the trial court found that Defendant's record of criminal activity was extensive. *Id.* § 40-35-115(b)(2) (1997). The

- 10 -

trial court noted that Defendant had committed numerous felonies and had been in jail "for quite a period of time" during the latter half of his life. The trial court noted that the State maintained that Defendant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." *See id.* § 40-35-115(b)(4). The trial court noted that Defendant's "conviction in Putnam County for the arson and this incident would lend some credence to that allegation." The trial court found that Defendant was on probation when he committed the instant offenses. *See id.* § 40-35-115(b)(6). The trial court ordered that Defendant's sentences for aggravated assault, assault, and resisting arrest run concurrently to each other but consecutively to Defendant's sentences for his convictions in Putnam County.

*Analysis*

Effective June 7, 2005, our state legislature, in response to the United States Supreme Court's opinion in *Blakely v. Washington*, 542 U.S. 296 (2004), amended several provisions of the Criminal Sentencing Reform Act. *See e.g.*, Tenn. Code Ann. § 40-35-210, Compiler's Notes. The amendments provided that they be applied to defendants who committed a criminal offense on or after June 7, 2005. *See id.* The amendments also provided that a defendant sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the amended provisions of the Act by executing a waiver of ex post facto protections. *See id.*

In the present case, Defendant committed the offenses in 1999, and the record does not include a written waiver executed by Defendant. Therefore, the 2005 amendments to the 1989 Sentencing Act do not apply to Defendant, and Defendant's sentence is governed by the provisions of the 1989 Sentencing Act.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b) (1997); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Imfeld*, 70 S.W.3d at 704.

- 11 -

When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (1997), Sentencing Comm'n Cmts. We will uphold the sentence imposed by the trial court if (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f) (1997).

*A. Sentencing Range*

Defendant contends that the trial court erred in finding him to be a persistent offender with regard to his conviction for aggravated assault. He maintains that those convictions that were entered on the same date should be considered one conviction for purposes of determining his sentencing classification.

A persistent offender is a defendant who has "[a]ny combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes, where applicable." Tenn. Code Ann. § 40-35-107(a)(1) (1997). "Convictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours constitute one (1) conviction for the purposes of determining prior convictions[.]" *Id.* § 40-35-107(b)(4) (1997). Thus, contrary to Defendant's argument, it is the date of the offense and not the date of the conviction that controls whether multiple convictions constitute one conviction for purposes of determining the prior convictions necessary to establish that a defendant is a persistent offender.

The State concedes that (1) Defendant's two prior convictions for receiving stolen property in case numbers 88-201-F and 88-203-F occurred on the same day and should be considered one conviction; (2) Defendant's convictions for second degree burglary and grand larceny in case number 1656 should be considered one offense because they share the same offense date; and (3) because the offense date for Defendant's conviction for concealing stolen property in case number 87-29-F was not established at the sentencing hearing, the conviction may not be considered in determining whether Defendant is a persistent offender. Regardless, Defendant still has at least five prior qualifying felony

convictions. *See* Tenn. Code Ann. §§ 39-1-303 (1982) (providing that persons aiding and abetting a criminal offense "shall be deemed principal offenders, and punished as such"), 39-14-107(4) (1997) (providing that theft over $10,000 is a Class C felony), 40-35-118 (listing the classification of felonies committed before November 1, 1989). Accordingly, the trial court sentenced Defendant as a persistent offender with regard to his aggravated assault conviction.

## B. Length of Sentences

Defendant challenges the length of his sentence for aggravated assault as excessive and contrary to the purposes of sentencing. As a Range III, persistent offender, Defendant was subject to a sentence of between ten and fifteen years for his aggravated assault conviction, a Class C felony. *See* Tenn. Code Ann. §§ 39-13-102(1)(B) (1997), 40-35-112(c)(3) (1997). Under the applicable law, unless enhancement factors were present, the presumptive sentence to be imposed was the minimum in the range for a Class C felony. *Id.* § 40-35-210(c) (1997). The pre-2005 sentencing act provided that, procedurally, the trial court was to increase the sentence within the range as appropriate based on the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. *Id.* § 40-35-210(d), (e) (1997).

The trial court applied four enhancement factors in sentencing Defendant to fourteen years for the aggravated assault conviction. On appeal, Defendant does not challenge the trial court's application of the enhancement factors. Because the criminal conduct resulting in Defendant's convictions occurred in 1999, we must apply the 1989 Sentence Act prior to the 2005 amendments. The Tennessee Supreme Court has concluded that for sentences imposed pursuant to Tennessee's former sentencing act, other than the fact of a prior conviction or facts admitted by the defendant, the trial court's enhancement of a defendant's sentence based on factors that had not been found by a jury beyond a reasonable doubt violated a defendant's Sixth Amendment right to a jury trial as interpreted by the United States Supreme Court. *State v. Gomez*, 239 S.W.3d 733, 741 (Tenn. 2007) (citing *Cunningham v. California*, 549 U.S. 270, 275 (2007)); *see also Blakely*, 542 U.S. at 301 ("'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'") (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Although Defendant did not challenge the trial court's application of the enhancement factors, we may consider the issue under a plain error review. *See State v. Jay Dee Garrity*, No. M2010-02592-CCA-R3-CD, 2012 WL 3939349, at *10 (Tenn. Crim. App. Sept. 11, 2012) (citing *Gomez*, 239 S.W.3d at 737). This court may find plain error only if

(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

*State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010) (citing *Gomez*, 239 S.W.3d at 737).

The record clearly establishes what occurred in the trial court. In addition to the prior criminal history enhancement factor, the trial court applied three other enhancement factors: (2) Defendant "was a leader in the commission of an offense involving two (2) or more criminal actors"; (9) Defendant possessed or employed a firearm or other deadly weapon during the commission of the offense; and (10) Defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(1), (2), (9), (10) (1997). Because Defendant was convicted of aggravated assault based on the use of a deadly weapon, the trial court erred in applying enhancement factor (9), the possession or employment of a deadly weapon during the commission of the offense, because the enhancement factor was an element of the offense. *See State v. Edward Pope*, No. M2009-01538-CCA-R3-CD, 2010 WL 3155205, at *5 (Tenn. Crim. App. Aug. 10, 2010) (holding that because the use of a deadly weapon is an element of the offense of aggravated assault as charged, the trial court erred in applying enhancement factor (9)); *see also* Tenn. Code Ann. § 40-35-114 (1997) (providing for the application of enhancement factors if they are not "essential elements of the offense as charged in the indictment"). With regard to enhancement factors (2) and (10), Defendant did not make any admissions and the jury did not make any findings with regard to these enhancement factors. Therefore, we conclude that a clear and unequivocal rule of law was breached in the application of these enhancement factors. *See Gomez*, 239 S.W.3d at 740-41.

A substantial right of Defendant was adversely affected by the trial court's application of these enhancement factors as it deprived Defendant of his Sixth Amendment right to have a jury determine whether enhancement factors (2) and (10) applied. *See id.* at 741. The record does not reflect that Defendant waived this right for tactical reasons. The record does not indicate that Defendant executed a waiver of ex post facto rights that would have allowed the trial court to sentence Defendant under the 2005 amendments to the Sentencing Act.

However, we cannot conclude that consideration of this issue is necessary to ensure substantial justice. Even though the trial court misapplied three enhancement factors, Defendant's prior criminal felony convictions beyond those necessary to establish his applicable range as a persistent offender were extensive. Defendant also had two prior misdemeanor convictions for public intoxication and prior convictions for

traffic infractions. He admitted during the sentencing hearing that he violated the conditions of his parole for his prior sentences on multiple occasions and that his parole was subsequently revoked as a result. *See id.* at 742 (holding that "a trial court may properly consider without jury findings a defendant's prior convictions, as well as prior criminal behavior admitted to by a defendant, when imposing sentence").

Both the Tennessee Supreme Court and this court have remanded cases to the trial court for resentencing when the trial court applied enhancement factors in violation of *Blakely* and despite the trial court's proper application of the prior criminal history enhancement factor because the record was not sufficiently well-developed for the court to determine the proper sentence based solely on the prior criminal history enhancement factor. *See Gomez,* 239 S.W.3d at 743; *Jay Dee Garrity,* 2012 WL 3939346, at *11. Unlike *Gomez* and *Jay Dee Garrity,* however, the record in this case sufficiently develops the extensive nature of Defendant's prior criminal history. We conclude that Defendant's prior criminal history beyond those convictions necessary to determine his sentencing range is so extensive that it justifies Defendant's fourteen-year sentence based on that enhancement factor alone. *See* Tenn. Code Ann. § 40-35-114(1) (1997). Accordingly, Defendant is not entitled to relief regarding this issue.

## C. Consecutive Sentences

Defendant challenges the trial court's order requiring him to serve his sentences consecutively to his sentences from his convictions in Putnam County that he was serving at the time of the sentencing hearing in the instant case. Tennessee Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is an offender whose record of criminal activity is extensive" or when "[t]he defendant is sentenced for an offense committed while on probation." Tenn. Code Ann. § 40-35-115(b)(2), (6) (1997). *Blakely* does not apply to Tennessee statutory scheme for imposing consecutive sentences. *State v. Allen,* 259 S.W.3d 671, 688 (Tenn. 2008).

The trial court found that Defendant's record of criminal activity was extensive, and the record certainly supports the trial court's finding. *See* Tenn. Code Ann. § 40-35-115(b)(2) (1997). The trial court also found that Defendant committed the offenses while on probation, and Defendant concedes on appeal that the trial court's finding is correct. *See id.* § 40-35-115(b)(6) (1997). While the trial court recognized the State's argument that Defendant was also a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," it does not appear that the trial court based its decision to impose partial consecutive sentences on this provision. *See id.* § 40-35-115(b)(4) (1997).

Defendant maintains that the trial court was not authorized to require him to serve his sentences for the instant offenses in White County consecutive to a sentence that he

was serving in Putnam County. He reasons that because he was convicted of the instant offenses in White County before he was convicted of the offenses in Putnam County, consecutive sentences were improper. The criminal episode whereby Defendant was charged with setting a series of wildfires in multiple counties resulted in charges in both White and Putnam County. Defendant was initially convicted for offenses in White County and then later convicted of multiple arson offenses in Putnam County. Following his convictions in Putnam County, this court reversed Defendant's White County convictions in the instant case and remanded the case for a new trial. *See Lester Arnold Clouse*, 2004 WL 193069, at *1. We note that following the release of this court's opinion reversing Defendant's White County convictions, this court affirmed Defendant's twelve arson convictions in Putnam County and resulting eighteen-year-sentence on direct appeal. *See State v. Lester Arnold Clouse*, No. M2002-01880-CCA-R3-CD (Tenn. Crim. App. Feb. 2, 2004). Accordingly, the convictions in the instant case were imposed after Defendant was convicted and sentenced in Putnam County. Defendant does not cite to any authority to support his argument that the trial court's imposition of partial consecutive sentences was improper. Rather, we conclude that the trial court properly ordered Defendant to serve his sentences for the convictions in the instant case consecutively to his sentences from the Putnam County convictions that he was serving at the time of the sentencing hearing.

## D. Resisting Arrest Conviction

Although not raised on appeal, we note that Defendant was indicted and convicted of resisting arrest as a Class B misdemeanor. *See* Tenn. Code Ann. § 39-16-602(a), (d) (Supp. 1999). The indictment did not allege that Defendant used a deadly weapon to resist the arrest, which would have elevated the offense to a Class A misdemeanor. *See id.* § 39-16-602(d) (Supp. 1999). During the sentencing hearing, the trial court and the parties mistakenly believed that the resisting arrest conviction was a Class A misdemeanor, and the trial court sentenced Defendant to eleven months and twenty-nine days for the conviction. The maximum authorized term of imprisonment for a Class B misdemeanor is six months. Tenn. Code Ann. § 40-35-111(e)(2) (1997). Accordingly, we reduce Defendant's sentence for resisting arrest to six months.

Furthermore, when the trial court entered the original judgments following the retrial in 2008, the trial court merged Defendant's resisting arrest conviction into his aggravated assault conviction. This issue was not raised on direct appeal of the retrial. *See Lester Arnold Clouse*, 2014 WL 7332181, at *1. Merger of offenses involves a double jeopardy issue and not a sentencing issue. *See State v. Watkins*, 362 S.W.3d 530, 539-59 (Tenn. 2012) (analyzing the issue of merger under double jeopardy principles). When this court reversed Defendant's sentence and remanded the case for a new sentencing hearing, this court did not reverse the trial court's decision to merge Defendant's resisting arrest conviction into his aggravated assault conviction. *See Lester*

- 16 -

*Arnold Clouse*, 2014 WL 7332181, at *11. Accordingly, we remand the case to the trial court for entry of a corrected judgment reflecting that Defendant's resisting arrest conviction is merged into his aggravated assault conviction.

*Conclusion*

Based on our review of the record and the applicable law, we affirm Defendant's sentences for aggravated assault and assault and reduce his sentence for resisting arrest to six months. We remand the matter to the trial court for entry of a corrected judgment reflecting that Defendant's sentence for the resisting arrest conviction is reduced to six months, but is merged into his aggravated assault conviction in accordance with the trial court's prior order.

THOMAS T. WOODALL, PRESIDING JUDGE